**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Lydia Marquez et al., | ) | CV-08-1132-PHX-NVW |
| Plaintiffs, | ) ) | **ORDER** |
| vs. | ) ) | |
| City of Phoenix et al., | ) ) | |
| Defendants. | ) ) | |

Before the Court are Defendant Taser International's ("Taser") Motion for Summary Judgment (Doc. 146), Defendants City of Phoenix, David Guliano and Joshua Roper's (collectively "City Defendants") Motion for Summary Judgment (Doc. 154), and Plaintiffs' Motion for Partial Summary Judgment (Doc. 150). Also before the Court are Taser's Motion to Exclude Plaintiffs' Expert Stanley Buchanan (Doc. 148) and Motion to Exclude Plaintiffs' Expert William Anderson (Doc. 149), Plaintiffs' Motion to Exclude Defense Expert Jeffrey Ho (Doc. 152), and City Defendants' Motion to Exclude Plaintiffs' Expert Ernest Burwell (Doc. 156), which Taser has joined (Doc. 157).

**I.    Background**

This case involves the death of fifty-two-year-old Ronald Marquez ("Marquez").[1] Marquez, his nineteen-year-old daughter Cynthia Marquez ("Cynthia"), and Cynthia's

---

[1]The facts are drawn from the parties' various statements of material facts and related affidavits and exhibits. Where the facts are disputed, the non-moving party's facts are taken as true and all inferences are drawn in the light most favorable to the non-moving party.

three-year-old daughter, Destiny, lived with Marquez's mother, Lydia Marquez ("Lydia"), in her house in Phoenix. On July 28, 2007, at approximately 7:30 a.m., Lydia's daughter, Georgina, called 911, and told the dispatcher that Marquez and Cynthia were performing an exorcism on Destiny.

Plaintiffs claim that Officer Roper arrived at the scene before Officer Guliano. When Officer Roper reached the house, the Marquez family explained that Cynthia had been in "a wreck" the week before, was prescribed medication for a bad head injury but did not want to take it, and had convinced herself that she was possessed by devils.[2] Cynthia was described as a nineteen-year-old who had no prior experience with law enforcement and had never been a problematic person. Officer Roper was told that Marquez was in his forties, was "a very superstitious person," and was attempting an exorcism on both Cynthia and Destiny.

Officer Guliano arrived shortly afterward and Officer Roper briefed him on the situation. The officers were directed by the Marquez family towards a back bedroom. As the officers approached the house, they could hear screaming and yelling coming from the bedroom. They heard a child yell "ow" or something similar. The officers hurried into the house and followed the screams to Marquez's closed bedroom door. Officer Roper heard banging, as if something was hitting the wall.

The officers announced, "Phoenix Police," and tried to enter the room, but a mattress had been pushed up against the door from the inside of the room. When the officers yelled "Police," the shouting coming from the room became louder. Officer Roper stated that he could no longer hear Destiny, while Officer Guliano stated that her screaming became even louder.

_____

[2]The statements of Officer Roper and Officer Guliano come from their respective interviews with the City of Phoenix Professional Standards Bureau conducted the day of the incident, July 28, 2007.

Officer Roper pushed his way into the bedroom doorway. He saw Marquez lying on the bed holding Destiny. It appeared to Officer Roper that Marquez either had Destiny in a choke hold or was squeezing her lower body. Cynthia was standing next to the bed naked and covered in blood.[3] There was also blood smeared on the walls and splattered throughout the room. Officer Roper stated that Destiny was completely quiet. He thought that, "whether it's intentional or not" Destiny was either dead or suffocating because Marquez was on top of her. Plaintiffs note that Officer Guliano stated that Destiny continued to cry through the entire ordeal.

Officer Roper drew his TASER ECD ("taser")[4] and said, "Let go of the child or I'm going to TASE you." Marquez looked at Officer Roper, but did not release Destiny. Officer Roper then deployed the taser's probes, striking the left side of Marquez's torso. The darts landed approximately three-and-a-half inches from each another.

---

[3]Cynthia testified in her deposition that her father had called her into the room the morning of the incident. She entered the room with Destiny and Marquez started yelling, "get the demon out of her." He then pushed the queen bed towards the door. Cynthia testified that she and Destiny were lying on the bed and that she felt her body become numb. Marquez then grabbed Destiny, leaned against Cynthia, and slapped her face. According to Cynthia, Marquez kept slapping her and trying to poke her eye out. Then, she "started blacking out, in and out." Cynthia then started fighting back as Marquez bit her, punched her, and kicked her. Marquez was holding Destiny by the waist as he and Cynthia fought.

[4]A TASER (X26 model) ECD is primarily activated in two ways: a probe deployment, where two metal darts fire via compressed nitrogen, with electrical impulses transmitted into the target through very thin insulated trailing wires; or in drive-stun mode, in which the taser is physically pressed against the target's skin. In probe mode or dart mode, where the darts are sufficiently separated, the taser works by stimulating skeletal muscles and causes incapacitation. Plaintiffs contend that Richard Guibault, Taser's director of training, testified that non-volitional movements, such as kicking of the legs and flailing of the arms are not an uncommon reaction to a taser application in probe mode, particularly where the probes are relatively close together, as they were in this case. In contrast, when a taser is deployed in drive-stun mode, the electrical impulses should stimulate a smaller area and cause discomfort or pain compliance and not incapacitation. Plaintiffs note that a drive-stun mode deployment can also cause involuntary muscle reactions and support that contention with several training videos prepared by Taser.

Officer Guliano stated that once Officer Roper deployed the taser, he believed Marquez was shocked or startled because he was able to grab Destiny out of Marquez's hands. Officer Roper stated that the taser application had no visible effect on Marquez, so he pulled the taser's trigger a second time. Thinking that the taser was still not having an effect, Officer Roper removed the taser's cartridge to try to see why the taser was not working as expected.

Officer Roper then closed the taser and approached Marquez but realized he was no longer holding Destiny. Officer Roper stated that Marquez, who was a large man weighing approximately 219 pounds, then began kicking him. Plaintiffs allege that Officer Roper acknowledged that once Officer Guliano had taken Destiny out of the room, the need to use the taser was eliminated or significantly reduced. Officer Roper stated, "So there's no need to tase him now cause the baby except that now he's assaulting me and he's combative and we're in a confined space, I'm by myself, Dave [Guliano]'s trying to get back in here so I go to try, to start trying to tase him again." Officer Roper also stated, "He's kicking me so I'm trying to, to tase him and taser's going, I'm flipping it on and off just cause I'm kinda panicking. I know and I know I'm doing it but I just kept doing it and I, I never got a solid contact on him." Plaintiffs contend that Marquez's kicks were in reality involuntary movements caused by Officer Roper's use of the taser.

Once Destiny was removed to safety, the officers attempted to handcuff Marquez. Officer Roper stated that he was still deploying his taser: "Yeah, I was pulling [the taser]. I hadn't let go. I don't know why, I just wasn't thinking about it, probably cause I, I was tensed up, I was squeezing it. I could hear it but like I said, I wasn't worried about it." Both officers stated that Marquez was struggling as they tried to handcuff him. Officer Roper stated that Marquez was swinging and kicking at the officers. Officer Guliano stated that both officers were "trying to get [Marquez's] arms behind his back, [but] he, he ain't cooperating, he's fighting, he, he's kicking, he's, he's swinging, he's trying to,

- 4 -

you know, pull himself away from us." Officer Guliano also stated that he "gave the suspect a couple of uh, uhm, closed fist strikes to his back, uh, because he was not pulling his, he, he was not cooperating and letting us get his arms behind his back. He was fighting us and every time we were grabbing on to him . . . he was either kicking away from us, or pushing us into the, uh, wall area or back into the door." He also noted that Officer Roper was using "the touch stun mode" of the taser.

Officer Guliano, however, did not believe Marquez was trying to assault the officers. Officer Guliano told Phoenix Professional Standards Bureau Officers Riggan and Tucker on the day of the incident:

> Tucker: Is the suspect, the male suspect making any contact with your, yourself or Officer Roper?

> Guliano: With, well, with me his, you know, his body was, uhm, th that's the contact that we were having was with his body. Was he physically punching me, no.

> Tucker: Okay.

> Guliano: Uh

> Riggan: What contact was he having then? What was, what part of his body was contacting you?

> Guliano: His, because, well when we were holding, his whole body because we were trying to gra- grab his arms but when he's pushing into the bed it's, you know, it's pushing everything, you know, so we're getting pushed up against the wall. Uhm, you know, Officer Roper's trying to, you know, balance himself on the other side. I'm still trying to fight with, you know, a door that's behind me, uhm, so we're, we're just getting knocked all over the place. Uhm, with him not sitting or not laying still or sitting still on the bed.

> Riggan: So he's not actually physically trying to assault you? You're trying to get him into custody and he's flailing?

> Guliano: Correct.

> Riggan: Is that right?

> Guliano: Correct.

Officer Guliano eventually succeeded in placing a handcuff on Marquez's right hand. At this point, Marquez was lying on his stomach, but his arms were still flailing.

Officer Guliano observed Officer Roper, who was to the left of Marquez, drive-stun Marquez. Officer Guliano then asked Officer Roper to hand him the taser to allow Officer Roper to use both hands to try to control Marquez. It appears that at this point, Officer Roper realized that the taser was working because he stated that he accidentally tased Officer Guliano while he was handing him the taser. Officer Guliano then deployed the taser on Marquez in drive-stun mode.

Eventually, the officers handcuffed Marquez. Officer Guliano stated that as soon as Marquez was handcuffed, the officers attended to Cynthia. Although there is a dispute as to exactly what Cynthia was doing while the officers were subduing Marquez, Plaintiffs refer to the statement of Officer Roper who said that throughout most of the ordeal, Cynthia, who was a very large woman, had been sitting, naked, on a bench in the room, rocking back and forth with a picture of Jesus Christ, chanting something. When the officers tried to grab Cynthia after securing Marquez, Cynthia began struggling as well. She was flailing about, which made it difficult for the officers to control her. Either Officer Guliano or Officer Roper tased Cynthia in drive-stun mode. Cynthia was eventually subdued with the help of other officers who arrived at the scene.

The parties dispute whether the officers continued to tase Marquez after he was handcuffed. Plaintiffs claim that Officer Roper stated, "we handcuffed him and then there was more tasing with him." However, City Defendants claim that Plaintiffs' assertion is based on a faulty transcription of the audio recording of Officer Roper's interview. Upon the Court's review of the audio tape of Officer Roper's interview, it is clear that Officer Roper stated, "And, there was no more tasing with him."

Plaintiffs contend that Officer Roper made a second statement that suggests Marquez was tased after he was handcuffed. The following exchange took place between Officer Roper and Officer Tucker of the Professional Standards Bureau:

> Tucker: Ok. Once you had possession of the taser again, how, do you recall approximately how many times you activated?

Roper: There was one more but not to the male cause he was already in handcuffs and on the bed. There was one to the female, which was a few seconds after he was handcuffed and rolled on his stomach.

...

Tucker: But then once you had possession of the taser again.

Roper: I, there was one activation that I connected with her.

Tucker: Okay

Roper: That I know worked because she did whatever it is that they do when, she, she tensed up as soon as it, I took it off, she relaxed, started fighting again, but uh, Officer Colon had arrived.

Tucker: Okay.

Roper: There was three of us so I, the tasing stopped then cause there was three of us.

...

Tucker: What part of the body did you make contact with, with the female?

Roper: Lower back.

Tucker: On that tasing?

Roper: Like on the side of, I don't know if it's the left side or right side. Um, but it was the lower back.

Tucker: Okay and did you attempt to make any other contact?

Roper: With her?

Tucker: With her, were there any other activations that resulted in not making contact with her that you remember?

Roper: I did attempt to but I don't remember if I was, if I had pulled the trigger and it was working or if I, it was just not and I was just trying to do it to, thinking that it was working.

Tucker: Okay, any idea how many activations of the taser you did in an attempt to do that.

Roper: I remember, I remember pulling it, flicking it on and off, and pulling it, and flicking it on and off, even after he was done, after he was handcuffed and on the bed. And I know that there was one good um, ___, one good uh, connection with her and then that was all, but I didn't holster it.[5]

---

[5]These statements are taken from the audio recording of Officer Roper's interview.

Defendants contend that the latter statement referred to the use of the taser on Cynthia after Marquez was handcuffed. Plaintiffs contend that the statement refers to the use of the taser on Marquez after he was handcuffed.

Once Cynthia was handcuffed, the officers looked back at Marquez who "[wasn't] looking too good." He was lying on the bed on his stomach, with his head turned to the side and his hands behind his back. Officer Roper approached Marquez and checked his pulse, which was weak. Officer Roper advised the fire department to assist immediately. According to Plaintiffs, the other officers who were present performed first aid.

Marquez was taken to a local hospital where he was pronounced dead. Following an autopsy, Dr. Kevin Horn concluded that Marquez had died from "excited delirium," which was the product of "adrenaline toxicity." Certain individuals, Dr. Horn explained, "have an overriding amount of dopamine in the brain." According to Dr. Horn, "dopamine is a precursor to adrenaline, and it also drives the fight-or-flight response of the brain." If those persons are restrained by mental health professionals or if they have an altercation with law enforcement, as they often will if they are actively psychotic, they are at special risk for sudden death because of the cardiac effects of too much adrenaline.

An examination of Marquez's heart revealed he had significant cardiovascular disease, consisting of an enlarged heart with thickened walls, narrowing of at least one major coronary artery, and microscopic fibrosis of the heart muscle. Dr. Horn listed "hypertensive/atherosclerotic cardiovascular disease" as a "significant contributing condition." He concluded that there was no evidence of positional asphyxia or neck/airway injuries, and that Marquez's cardiac arrest could not be "directly attributed" to the taser deployments.

Plaintiffs allege that in a span of three minutes and four seconds, Officer Roper's taser was deployed twenty-two times, for a total deployment time of 123 seconds. Defendants contend and Plaintiffs admit that some of those deployments were ineffective--some were delivered to Cynthia, and at least in one instance, the taser shocked one of the

officers. Plaintiffs allege, however, that Marquez was tased between ten and fourteen times. Dr. Horn testified that there were "at least six, possibly seven, touch-tase sites," as well as one set of darts embedded in Marquez's body."

## II.    Motions for Summary Judgment

### A.    Summary Judgment Standard

Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).

The moving party bears the initial burden of informing the district court of the basis for its motion. *Id.* at 323. The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue for trial. Fed. R. Civ. P. 56(e). The non-moving party may not rely solely on the allegations or denials of its own pleading, but must come forward with specific facts to show that there is a genuine issue of material fact. *See id.*

When evaluating a motion for summary judgment, the court views the evidence through the prism of the evidentiary standard of proof that applies at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The evidence of the non-movant is believed, and all justifiable inferences are drawn in his favor. *Id.* Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue of material fact for trial and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

### B.    Taser and Plaintiffs' Motions for Summary Judgment

#### 1.    Failure to Warn

Plaintiffs claim that Taser did not adequately warn of the risk of death or injury in the circumstances of this case. When a strict products liability claim is premised upon an information defect, a plaintiff must establish that: (1) the defendant had a duty to warn; (2) the lack of an adequate warning rendered the product unreasonably dangerous and defective; (3) the lack of sufficient warning existed when the product left the defendant's control; and (4) the failure to provide an adequate warning proximately caused the plaintiff's injuries. *See Gosewisch v. Am. Honda Motor Co., Inc.*, 153 Ariz. 400, 403, 737 P.2d 376, 379 (1987). Both strict liability and negligence standards impose a duty to produce products with appropriate warning instructions. *Wilson v. U.S. Elevator Corp.*, 193 Ariz. 251, 256, 972 P.2d 235, 240 (Ct. App. 1998). Taser contends that its warnings were adequate as a matter of law, that Plaintiffs lack a warnings expert and cannot show Taser's warnings were inadequate, and that Plaintiffs have no evidence that the officers would have heeded a different warning.

The taser that was used on Marquez was shipped on July 31, 2006. The warnings in effect at that time were from June 8, 2006, and included Taser's Version 13 training materials. The relevant warnings state:

> WARNING . . . Electronic Control Device . . . Temporarily incapacitates target . . . Can cause injury.
>
> * * *
>
> TASER electronic control devices are weapons designed to incapacitate a person from a safe distance while reducing the likelihood of serious injuries or death. Though they have been found to be a safer and more effective alternative when used as directed to other traditional use of force tools and techniques, it is important to remember that the very nature of use of force and physical incapacitation involves a degree of risk that someone will get hurt or may even be killed due to physical exertion, unforeseen circumstances and individual susceptibilities.
>
> * * *
>
> Control and Restrain Immediately. Begin control and restraint procedures as soon as it is reasonably safe to do so in order to minimize the total duration of exertion and stress experienced by the subject.
>
> * * *

Deployment Health Risks

Sudden In-Custody Death Syndrome Awareness. If a subject is exhibiting signs or behaviors [footnote] that are associated with Sudden In-Custody Death Syndrome, [footnote] consider combining use of a TASER device with immediate physical restraint techniques and medical assistance.

[footnote] Signs of Sudden In-Custody Death Syndrome include: extreme agitation, bizarre behavior, inappropriate nudity, imperviousness to pain, paranoia, exhaustive exertion, "superhuman" strength, hallucinations, sweating profusely, etc.

[footnote] Sudden in-custody death results from a complex set of physiological and psychological conditions characterized by irrational behavior, extreme exertion, and potentially fatal changes in blood chemistry. Promptly capturing, controlling, and restraining a subject exhibiting signs of these conditions may end the struggle and allow early medical care intervention.

Continuous Exposure Risks. When practical, avoid prolonged or continuous exposure(s) to the TASER device's electrical discharge. In some circumstances, in susceptible people, it is conceivable that the stress and exertion of extensive repeated, prolonged, or continuous application(s) of the TASER device contribute to cumulative exhaustion, stress, and associated medical risk(s).

Other Conditions. Unrelated to TASER exposure, conditions such as excited delirium, severe exhaustion, drug intoxication or chronic drug abuse, and/or over-exertion from physical struggle may result in serious injury or death.

Breathing Impairment. Extended or repeated TASER device exposures should be avoided where practical. Although existing studies on conscious human volunteers indicate subjects continue to breathe during extended TASER device applications, it is conceivable that the muscle contractions may impair a subject's ability to breathe. In tests conducted on anesthetized pigs, repeated TASER device applications did cause cessation of breathing during TASER device discharges, although it is unclear what impact the anesthesia or other factors may have had on the test results. Accordingly, it is advisable to use expedient physical restraint in conjunction with the TASER device to minimize the overall duration of stress, exertion, and potential breathing impairment particularly on individuals exhibiting symptoms of excited delirium and/or exhaustion. However, it should be noted that certain subjects in a state of excited delirium may exhibit superhuman strength and despite efforts for expedient restraint, these subjects sometimes cannot be restrained without a significant and profound struggle.

These warnings capture the circumstances of this case. Taser initially warns that the use of a taser involves physical incapacitation and that "the very nature of the use of force *and physical incapacitation* involves a degree of risk that someone will get hurt or

may even be killed due to physical exertion, unforeseen circumstances and individual susceptibilities." (emphasis added). Taser then warns that "prolonged or continuous" exposure to a taser's electrical charge should be avoided because, in susceptible people, it is conceivable that the stress and exertion of repeated applications could contribute to exhaustion, stress, and associated medical risks. This is what Plaintiff's claim happened in this case.[6]

Plaintiffs contend that the warnings do not convey that the use of a taser has any special limitations, but only that, as with "any" use of force, there is a "risk that someone will get hurt or may even be killed." The warning does not suggest that the use of a taser will not result in injury, but rather that a taser, like other uses of force, can cause injury. The warning then specifically states that prolonged or continuous use of a taser should be avoided because it could contribute to stress, exhaustion, and associated medical risks in susceptible people. The warning therefore does convey a special limitation on the use of a taser; specifically, that continuous use should be avoided because of the risk of harm to susceptible people.

Plaintiffs also take issue with the "Other conditions" section of the warnings, which state: "*Unrelated to TASER exposure*, conditions such as excited delirium, severe exhaustion, drug intoxication or chronic drug abuse, and/or over-exertion from physical struggle may result in serious injury or death." (emphasis added). Plaintiffs argue that the warnings address the possibility of serious injury or death only in the context of discussing conditions "unrelated to TASER exposure" or when discussing "the very nature of use of force." These statements, however, cannot be viewed in isolation. The warnings state several times that prolonged use of a taser should be avoided. The

---

[6]Plaintiffs' theory is that the prolonged use of the taser significantly increased the levels of adrenaline and other stress-related hormones in Marquez's body, which in turn interfered with the normal functioning of Marquez's respiratory muscles, leading to cardiorespiratory compromise and eventually death.

warnings also state that it is conceivable that the use of a taser could cause injury to susceptible people.  Plaintiffs fail to explain what else the warnings could or should have said.  The Court therefore finds that Taser's warnings were adequate, and Taser is entitled to summary judgment on Plaintiffs' informational defect claims.  Because the Court has found that Taser's warnings were adequate, it need not decide whether Plaintiffs need a warnings expert or whether Plaintiffs have evidence that the officers would have heeded a different warning.

### 2. Cause of Death

Because the Court has found that Taser's warning was adequate as a matter of law, it need not decide whether Plaintiffs can show that the taser caused Marquez's death.  Plaintiffs' partial motion for summary judgment regarding causation is therefore rendered moot and will be denied.

### C. City Defendants' Motion for Summary Judgment

### 1. Constitutional Violation

Plaintiffs claim that the officers used excessive force against Marquez in violation of his Fourth Amendment rights.  The Fourth Amendment requires police officers making an arrest to use only an objectively reasonable amount of force.  *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007).  The question in all cases is whether the use of force is objectively reasonable in light of the facts and circumstances confronting the arresting officers.  *Id.*

In *Bryan v. McPherson*, the Ninth Circuit held that the use of a taser X26 constitutes an intermediate or medium, though not insignificant, quantum of force.  608 F.3d 614, 622 (9th Cir. 2010).  As a result, the use of a taser must be justified by a strong government interest that compels the employment of such force.  *Id.*  Although *Bryan's* rule is stated broadly, not all uses of a taser necessarily constitute an intermediate level of force.  In *Brooks v City of Seattle*, decided nearly contemporaneously, a Ninth Circuit panel found that three applications of a taser in drive-stun mode, which produces only

pain compliance, was a less significant intrusion than the use of a taser in dart mode, which results in incapacitation and pain. 599 F.3d 1018, 1027-28 (9th Cir. 2010). The use of the taser in drive-stun mode constituted a "less than [an] intermediate" quantum of force. *Id.*

To determine whether the quantum of forced used by an officer is reasonable, courts must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake. *Id.* The factors relevant to this inquiry include, but are not limited to, "'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Courts should consider the totality of the circumstances in evaluating whether the use of force was reasonable. *Id.* at 1025.

Plaintiffs concede the officers' initial use of the taser was justified. It is undisputed that the officers believed that Marquez, "whether intentionally or not" was suffocating or hurting Destiny. Although Plaintiffs contend that the officers' main concern was Destiny, it is also undisputed that the officers had reason to believe that Marquez had injured Cynthia, who was standing in the room naked, bloodied, with a torn lip, and a puffy eye. Plaintiffs nonetheless contend that once Destiny was removed to safety, the officers should have retreated and allowed a mental health professional to handle the situation or reassessed their use of force and abandoned the use of the taser.

"Officers . . . need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). As explained below, the officers had probable cause to believe Marquez had committed serious offenses. Further, leaving the room could have placed Cynthia in danger. The officers were therefore not required to retreat. Marquez's bizarre and possibly psychotic behavior does not change

- 14 -

the analysis. *See Gregory v. County of Maui*, 523 F.3d 1103 (9th Cir. 2008) (finding that police officers did not use excessive force by pinning man to the ground and holding his head and neck to restrain him where man wielded pen against police and appeared "high strung, excitable, and jumpy," was speaking loudly and rapidly, and loudly announced that he was a Christian and that God was with him).

It was therefore reasonable for the officers to use some quantum of force to subdue Marquez. But even where some force is justified, the amount actually used may be excessive. *Blankenhorn*, 485 F.3d at 477. The Court must consider the *Graham* factors to determine whether the officers' use of force was excessive.

### a. *Graham* Factors

### (1) Severity of the Crime

The first *Graham* factor takes into account the severity of the crime at issue. There is no question that the crimes at issue here were serious. When the officers entered the room they had reason to believe that Marquez had injured Cynthia and was suffocating or otherwise hurting Destiny, a three-year-old child.

Plaintiffs respond that the officers had reasonable suspicion to investigate what appeared to be some strange and potentially felonious events in the bedroom, but without further explanation or investigation, did not yet have probable cause to arrest anyone. However, establishing a lack of probable cause does not establish an excessive force claim. *Brooks*, 599 F.3d at 1022. "Indeed, an arrestee's resistance may support the use of force regardless of whether probable cause existed." *Id.*

Nonetheless, the existence of probable cause may be considered as part of the totality of the circumstances affecting the excessive force analysis. *Id.* Probable cause exists when the facts and circumstances within an officer's knowledge are sufficient to cause a reasonably prudent person to believe a crime has been committed. *Id.* Plaintiffs' contention that the officers lacked probable cause would be more persuasive if Plaintiffs also did not concede that the officers had reason to believe Destiny was in danger when

- 15 -

they entered the room. The officers also had reason to believe Marquez had assaulted Cynthia. When the officers entered the room, there was blood in the walls and Cynthia was visibly injured. A reasonably prudent person could have concluded Marquez inflicted those injuries. The officers therefore had probable cause to believe Marquez had committed one or more serious offenses.

### (2) Threat to Others

The threat posed by the suspect is the most significant *Graham* factor. *Bryan,* 608 F.3d at 622. Plaintiffs do not directly address this factor but state that the "emergent situation" disappeared once Destiny was taken out of the room. Plaintiffs claim that Marquez was unarmed and lying on a bed, and that the officers chose to escalate the situation by continuing to deploy the taser. Defendants respond that Marquez was kicking and attempting to punch the officers. Plaintiffs offer in rebuttal Officer Guliano's statement that Marquez was not physically assaulting the officers but was struggling or flailing as the officers attempted to handcuff him.

At this stage of the proceedings, the Court must take all of Plaintiffs' evidence as true and draw all reasonable inferences in Plaintiffs' favor. Therefore, the Court must assume that Marquez was not purposefully attempting to assault the officers but was struggling or flailing as the officers attempted to handcuff him. However, Marquez's struggle with the officers goes to whether he was resisting arrest not to whether he posed a threat to the officers or to others. The facts known to the officers at the time suggested that Marquez was a threat to them and/or Cynthia. Marquez, although unarmed, was a very large man. He initially refused to let go of Destiny, and was suspected of injuring both Destiny and Cynthia. The incident took place in a small, confined area, and Cynthia was still in the room during the struggle. Under these circumstances, it is reasonable to conclude that Marquez was a threat to the officers and/or Cynthia.

### (3) Resistance or Flight

- 16 -

The last *Graham* factor is whether the suspect resisted arrest or attempted flight. The Court's analysis of this factor is complicated by the dispute over whether Marquez was voluntarily resisting arrest or was flailing in response to the tasings. The Court is mindful that Marquez died as a result of the confrontation and is not present to testify. Cases in which the victim of alleged excessive force has died pose a particularly difficult problem in assessing whether the police acted reasonably, because the witness most likely to contradict the officers' story is unable to testify. *See Gregory*, 523 F.3d at 1107. Accordingly, courts must carefully examine all the evidence to determine if the officer's account of the events is credible and should deny summary judgment where a jury might find an officer's testimony that he was restrained in his use of force not credible. *Id.*

The evidence reflects there was an active struggle between the officers and Marquez. It should be noted that Plaintiffs do not allege that the officers knew that Marquez was uncontrollably flailing in response to the taser and yet continued to tase him. Although reasonableness is an objective standard, it must be assessed in light of the facts known to the officers. Had the officers known that Marquez was simply flailing in response to the taser and yet continued to tase him, this factor would weigh in favor of Marquez. However, Officer Guliano's testimony, upon which Plaintiffs rely, was that Marquez was fighting the officers, even though he was not "assaulting" them. Officer Guliano stated on several occasions that Marquez was kicking and swinging. He also stated Marquez was "pushing into the bed," that the officers were trying to "balance" themselves in close quarters, and that they were "getting knocked all over the place" because Marquez was not sitting or laying still. Under these tense, uncertain, and rapidly evolving circumstances, a reasonable officer could have concluded that Marquez was actively resisting arrest. *See Blankenhorn*, 485 F.3d at 477 ("When appropriate, [the] reasonableness determination must also make 'allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular

situation.'" (quoting *Graham*, 490 U.S. at 396-97)).  At most, this factor is inconclusive and weighs neither in favor nor against a finding that the officers' use of force was excessive.

### (3)    Other Factors

"[A] consideration of the totality of the circumstances may look to other factors as well."  *Brooks*, 599 F.3d at 1029.  The availability of alternative methods to restrain an individual is a proper factor to consider.  *Id.*  Plaintiffs contend that because the use of the taser was not helping subdue Marquez (and/or was causing him to flail), the officers should have used "other means" to control Marquez.  However, Plaintiffs fail to identify what else the officers could have done in the situation that confronted them.  Plaintiffs suggest that the officers should have allowed officers experienced in counseling the mentally ill handle the situation.  However, there is no evidence that such officers were available at the time.  Further, as explained, it was reasonable for the officers to believe they needed to subdue Marquez immediately.  Therefore, this factor does not weigh in favor of finding the officers used excessive force.  *See id.* at 1029-30 (explaining that the availability of alternative methods of controlling a person is a proper factor to consider in analyzing whether an officer used excessive force but mere general statements that there were better means of controlling the person are insufficient to weigh in favor of finding that an officer acted unreasonably).

Whether the officers issued a warning before using force is another relevant factor.  *See Deorle v. Rutheford*, 272 F.3d 1272, 1280-31 (9th Cir. 2001) (finding that warnings should be given when feasible); *Bryan*, 608 F.3d at 627 (considering the failure to warn as a factor militating against the reasonableness of the use of a taser).  Here, the officers warned Marquez that if he did not let go of Destiny he would be tased, and therefore this factor weighs in favor of finding the use of force was reasonable.

Courts may also consider what an officer knew about a suspect's health.  *Brooks*, 599 F.3d at 1030.  Plaintiffs contend that the officers could easily ascertain that Marquez

was irrational and possibly psychotic.  The Ninth Circuit has held that the tactics employed against an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest should ordinarily be different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense.  *Bryan*, 608 F.3d at 625.  In such a case, the governmental interest in using force is diminished.  *See id.*

The officers likely knew they were confronted with a mentally ill individual, or at least one who was exhibiting irrational behavior.  On the other hand, this is not a case in which the individual "had not committed a crime, was not a danger to himself or others, and did not offer resistance."  *See Gregory*, 523 F.3d at 1108-09 (finding that force used against "emotionally distraught" individual was not excessive because the officers first attempted to verbally coax plaintiff, had reason to believe that plaintiff posed a threat to them, and plaintiff had already assaulted another person).  Nor is this a case in which officers were called to "help protect" Marquez.  *See Drummond v. City of Anaheim*, 343 F.3d 1052, 1054-55 (9th Cir. 2003) (reversing grant of summary judgment for police officers on excessive force claim where officers knocked plaintiff to the ground even though officers had been called to help protect a mentally ill plaintiff, and plaintiff had not committed a crime, was not a danger to himself or others, and did not offer resistance).  This factor therefore does not weigh in favor of finding the use of force excessive.

Having considered the *Graham* factors as well as the other factors elaborated by the Ninth Circuit, the Court cannot conclude that the officers' use of force was excessive. Plaintiffs concede that the first two dart mode deployments, while Marquez was still holding Destiny, were justified.  It also appears that all of the other tasings were conducted in drive-stun mode.  In their briefs, Plaintiffs stated:  "Roper acknowledged that he never actually stopped deploying the Taser, but continually attempted to *drive stun* Marquez." (emphasis added).  Also, in response to City Defendants' claim that the

amount of electricity discharged on Marquez was unknown, Plaintiffs stated: "The Professional Standards Bureau of the Phoenix Police Department concluded that 'Officer Roper *touch tased* Mr. Marquez numerous times,' . . . and that Officer Guliano also "*touch tased* Mr. Marquez numerous times" after Roper had handed Guliano the Taser. . . ." (emphasis added). While multiple tasings in drive-stun mode could constitute excessive force, the repeated use of a taser in drive-stun mode has been found to be a lesser quantum of force than the use of a taser in dart mode. *See Brooks*, 599 F.3d at 1027-28.

At oral argument, Plaintiffs stated that they dispute that no other tasings in dart mode occurred after the first two tasings. Plaintiffs averred that Officer Roper stated in deposition that after initially removing the cartridge from the taser to see if was working properly, he reinserted it and continued to use the taser in dart mode. However, Plaintiffs were unable to refer the Court to the portion of the record that substantiates their claim. The Court has examined the parties' briefs but has not been able to locate a statement to that effect by Officer Roper.

Regardless, even if Marquez was tased in dart mode after Destiny was removed from the room, the quantum of force used was still reasonable. The *Graham* factors continue to weigh against finding the use of force was excessive–the officers were confronted with an individual suspected of serious crimes, who was a potential threat, and who, by all accounts, was resisting arrest.

In *Sanders v. City of Fresno*, a district court found that several officers did not use excessive force in very similar circumstances. 551 F. Supp. 2d 1149 (E.D. Cal. 2008), *aff'd* 340 F. App'x 377 (9th Cir. 2009) (unpublished). In that case, a wife and a husband were having a dispute, and the husband was acting irrationally. *Id.* at 1155. The husband called 911 and said that someone was trying to kill him. *Id.* When the officers arrived at the couple's home, they heard yelling inside. *Id.* at 1156. The wife answered the door and the officers could see that the husband, who was naked and dripping wet, was holding

the wife by the torso. *Id.* The husband told the officers that they would not take his wife from him. *Id.* The husband, however, was unarmed and the officers could see his hands. *Id.* The wife was crying and upset, but was uninjured. *Id.* at 1157. At some point, the husband pulled his wife causing them both to fall. *Id.* Fearing that they had an emergent hostage situation and seeing that the husband was sliding toward the kitchen, which was "a source of weapons," the officers deployed their tasers. *Id.* at 1158.

The first officer used his taser in dart mode without warning the husband that he would be tased. *Id.* at 1158. The darts struck the husband in his upper body, but apparently did not have an effect because the husband began struggling with the officers and screaming. *Id.* In the meantime, the wife was helped up by another officer and was safely removed to another room. *Id.* Twenty to thirty seconds later, the first officer fired his taser again for a total of two, five-second cycles. *Id.* at 1173. Because the husband continued to struggle, the first officer tased the husband a third time. *Id.* at 1173-74,

In the meantime, a second officer shot his taser for one cycle, but the husband continued to struggle. *Id.* at 1174-75. The second officer then deployed the taser again, sending between two and four five-second cycles into the husband. *Id.* at 1159. A third officer, who had attempted to tackle the husband, then took the second officer's taser and applied five drive-stun tasings to the husband's groin area. *Id.* at 1160. Eventually, the husband stopped resisting and the officers handcuffed him. *Id.* Shortly afterward, the husband began having breathing problems and died. *Id.* at 1161.

The court concluded that the officers did not use excessive force because, even though the husband was tased on numerous occasions, the police were confronted with a rapidly evolving situation involving a person who, although unarmed and irrational, was suspected of misdemeanor assault, battery, and false imprisonment, which were "medium level crimes," was a potential threat to a bystander (the wife), and was resisting arrest. *Id.* at 1168-77. In the alternative, the court found that the officers were entitled to qualified immunity and that the plaintiff had no evidence that the City of Fresno had inadequately

trained its officers. *Id.* The Ninth Circuit affirmed the district court in an unpublished

opinion in all respects. *See Sanders*, 340 F. App'x at 378.

The conclusion that the police did not use excessive force is much more

compelling in this case than in *Sanders*. In this case, the officers warned Marquez that he

would be tased; in *Sanders*, the officers gave no warning. Here, Marquez was suspected

of assaulting his daughter and possibly a small child. In *Sanders*, there was no evidence

that the husband had injured his wife. Finally, in *Sanders*, three officers were deploying

two tasers almost simultaneously and there were numerous deployments in dart mode,

some of which lasted as long as ten or twenty seconds. There were also five deployments

in drive-stun mode to the groin area. Here, the tasings at issue were in drive-stun mode;

although, as noted, it is possible that some were in dart mode. In sum, this case presents a

potentially less-than-intermediate to intermediate use of force, prefaced by warnings,

against an individual suspected of serious offenses, who posed a threat to others, where

there appeared to be some resistance, although it is not clear how much. In these

circumstances, assuming all facts in favor of Plaintiffs, the officers' use of force was not

unconstitutionally excessive.

### b.     Use of Force After Marquez was Handcuffed

Plaintiffs nonetheless contend that even if the force used on Marquez while he was

being handcuffed was not unreasonable, the officers used excessive force because they

continued to tase Marquez after he was handcuffed. Where police have control over a

suspect, the use of further force to bring the suspect under control may be unreasonable.

*Brooks*, 599 F.3d at 1025. In making this claim, Plaintiffs rely on a sentence from the

transcript of Officer Roper's interview in which Officer Roper allegedly states: "we

handcuffed him and then there was more tasing with him." However, as explained above,

upon the Court's review of the audio tape of Officer Roper's interview, it is clear that

Officer Roper stated, "And, there was no more tasing with him." This statement therefore

does not support Plaintiffs' claim.

Plaintiffs also rely on Officer Roper's statement that he remembered clicking the taser on and off after Marquez was handcuffed on the bed. However, considered in context, it appears that Officer Roper was referring to the use of the taser on Cynthia. Officer Roper initially stated that once Marquez was handcuffed, the taser was no longer used on him:

> Tucker: Ok. Once you had possession of the taser again, how, do you recall approximately how many times you activated?
>
> Roper: There was one more but not to the male cause he was already in handcuffs and on the bed. There was one to the female, which was a few seconds after he was handcuffed and rolled on his stomach. (53:50)

A few seconds later, while discussing the use of the taser on Cynthia, Officer Roper stated:

> Tucker: Okay and did you attempt to make any other contact?
>
> Roper: With her?
>
> Tucker: With her, were there any other activations that resulted in not making contact with her that you remember?
>
> Roper: I did attempt to but I don't remember if I was, if I had pulled the trigger and it was working or if I, it was just not and I was just trying to do it to, thinking that it was working.
>
> Tucker: Okay, any idea how many activations of the taser you did in an attempt to do that.
>
> Roper: I remember, I remember pulling it, flicking it on and off and pulling it and flicking it on and off, even after he was done, after he was handcuffed and on the bed. And I know that there was one good um, ___, one good uh, connection with her and then that was all, but I didn't holster it.

This isolated statement is insufficient to create a triable issue of fact. In *Gregory*, where the police confronted an individual who was wielding a pen, plaintiffs contended, based on the testimony of a single witness, that there was a triable issue as to whether the individual held the pen. 523 F.3d at 1107. The witness testified that he had not heard the police ask the individual to put down the pen. *Id.* However, the confrontation between the police and the plaintiff had taken place in a music studio and the witness was outside the studio the entire time. *Id.* The court found that, under those circumstances, the

- 23 -

isolated statement of the witness did not create a triable issue of fact. *Id.* Here, likewise, there is simply no evidence that the officers tased Marquez after he was handcuffed on the bed other than a single statement that appears to refer to the use of the taser on Cynthia. This statement therefore cannot create a triable issue of material fact. *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986) (holding that the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to create a triable issue of material fact).

For all of these reasons, the Court concludes that there was no Fourth Amendment violation.

## 2.  Qualified Immunity

Even if there was a constitutional violation, the officers would be entitled to qualified immunity. The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009). Qualified immunity balances the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Id.*

To determine whether an officer is entitled to the protection of qualified immunity the court must consider whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. *Id.* at 216. The court must also decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Id.* The court need not address these questions in order. *Id.* at 218.

Whether a right is "clearly established" has two aspects. First, whether, based on the clarity of the law at the time of the alleged violation, the contours of the right were sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Second, whether,

- 24 -

based on the facts of the particular case, a reasonable defendant would have understood that his conduct violated the plaintiff's constitutional rights. *See id.* Qualified immunity generally protects all but the plainly incompetent or those who knowingly violate the law. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

If an officer's use of force was premised on a reasonable belief that such force was lawful, the officer is entitled to qualified immunity. In *Bryan*, the Ninth Circuit held that an officer's use of a taser in dart mode against an individual who was clearly unarmed, not threatening the officer, and not attempting to flee constituted excessive force. However, the court concluded that, although there does not have to be closely analogous case law for a right to be clearly established, as of July, 24, 2005, when the events in question occurred, there was no Supreme Court decision or decision of the Ninth Circuit that addressed whether the use of a taser in dart mode constituted an intermediate level of force. Therefore, the officer could have made a reasonable mistake of law regarding the constitutionality of the use of the taser in the circumstances the officer confronted in July 2005.

The first time the Ninth Circuit announced that the use of a taser in dart mode constitutes an intermediate level of force was in 2009. *See Bryan v. McPherson*, 590 F.3d 767 (9th Cir. 2009), *superseded by* 608 F.3d 614. The events at issue here took place in 2007, before the Ninth Circuit had articulated this rule. Nonetheless, this is not dispositive because, as the court acknowledged citing to *Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009), an officer can violate an individual's clearly established rights where the officer's conduct lies so obviously at the core of what the Fourth Amendment prohibits that its unlawfulness should be readily apparent notwithstanding the lack of fact-specific case law. *Bryan*, 608 F.3d at 629.

*Oliver* involved an obviously mentally ill man who had flagged down the police while standing in a grassy median in the middle of a busy road. 586 F.3d at 902-03. The man complied with all police directives, but would not leave the median, saying "they're

shooting at me" and pointing across the street. *Id.* The officers attempted to coax the man to the other side of the street but he would not cross. *Id.* The officers then tried to force the man to cross but he struggled and pulled way. *Id.* The man did not try to grab the officers or to swing at them. *Id.* One officer, nevertheless, without warning, tased the man in dart mode. *Id.* The probes hit the man's abdomen and brought him to the ground. While the taser cycled for five seconds (the "window of opportunity" during which the subject remains incapacitated), the officers did not try to handcuff the man or move him. *Id.* Three to four seconds after the first taser cycle ended, the officer tased the man once again. *Id.* Ten seconds after the second cycle, the officer tased the man for the third time. *Id.* This, although the man never got up or attacked the officers and was lying on the scorching hot asphalt screaming in pain. *Id.* After the third or fourth tase, one of the taser wires became disconnected. *Id.* The officer then reloaded the taser and began tasing the plaintiff again. *Id.* That tase and the next three or four cycles caused the plaintiff to be totally immobilized, leaving him clenched up and lying on his back. *Id.* The officer said that when she tased the plaintiff the last time (the eight recorded tase) he was lying flat and did not get up. *Id.* Shortly thereafter the plaintiff had a seizure and died. *Id.*

The court first found that the use of force was not justified. *Id.* at 907. The court then found that although no previous opinion from the United States Supreme Court, the Eleventh Circuit, or the Florida Supreme Court had clearly established that an officer's repeated use of a taser constituted excessive force, tasing the plaintiff at least eight and as many as eleven or twelve times over a two-minute span without attempting to arrest or otherwise subdue him–including tasing him while he was writhing in pain on the hot pavement and after he had gone limp and immobilized–was so plainly unnecessary and disproportionate that no reasonable officer could have thought that amount of force was legal. *Id.* at 907-08.

The facts of *Oliver* are distinguishable from those of this case. Plaintiffs admit that the initial tasing of Marquez was reasonably necessary because they officers justifiably believed Destiny was in danger. Also, the officers warned Marquez that he would be tased if he did not let go of Destiny. Finally, the officers tried to handcuff Marquez immediately and did not continue to tase him after he was incapacitated.

Plaintiffs nevertheless contend that the officers' use of force was clearly unlawful because Marquez was in reality flailing as a result of the tasings and never had the opportunity to submit. As explained earlier, this contention is belied by the record. In any event, Plaintiffs do not contend that the officers knew Marquez was not resisting arrest. Instead, Plaintiffs claim that the officers were not properly trained to distinguish between active resistance and flailing movements caused by a taser.

Qualified immunity applies whether an officer's error is a mistake of law, a mistake of fact, or a mistake of the application of law to facts. An officer will not be liable for mere mistakes in judgment. *Butz v. Economou*, 438 U.S. 478, 507 (1978) (cited with approval by *Pearson*, 129 S. Ct. at 816). Thus, even if the officers mistakenly thought that Marquez was resisting arrest, they are still entitled to qualified immunity.

This is not one of those cases in which the officers' conduct was so plainly unnecessary and disproportionate that no reasonable officer could have thought that the force used was legal. Thus, *Bryan* applies. Absent a clear statement of law, the officers could have made a reasonable mistake of law regarding the constitutionality of the use of the taser in the circumstances they confronted in 2007. *See Bryan*, 608 F.3d at 628-29. Therefore, they are entitled to qualified immunity.

### 3. *Monell* Liability

Plaintiffs contend that the City of Phoenix should be held liable for the constitutional violation of Marquez's rights. The Court has already determined that there was no constitutional violation, and therefore no 28 U.S.C. § 1983 liability flows to the City. But even assuming there was a constitutional violation, the City is entitled to

summary judgment because Plaintiffs have not met their burden to establish that there is a genuine issue of material fact for trial.

A municipality may be held liable under § 1983 if its deliberate policy caused a constitutional violation. *See Monell v. Dep't of Social Services of New York*, 436 U.S. 658, 694 (1978). Because the policy Plaintiffs complain of is a failure to train, they must show that: (1) Marquez was deprived of a constitutional right; (2) the City had a training policy that "amounts to deliberate indifference to the constitutional rights of the persons with whom its police officers are likely to come into contact;" and (3) the constitutional injury would have been avoided had the City of Phoenix properly trained those officers. *Blankenhorn*, 485 F.3d at 484.

Plaintiffs have no evidence that the City inadequately trained its officers.[7] "Mere proof of a single incident of errant behavior is a clearly insufficient basis for imposing liability on [a municipality]." *Merritt v. County of Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989). Plaintiffs claim that the officers stated that they acted in conformity with their training. However, evidence of the failure to train a single officer is insufficient to

---

[7]Plaintiffs have offered the opinion of Mr. Burwell that the City inadequately trained its officers. Although police practices expert testimony has been held to be admissible in many cases, such testimony must meet *Daubert*. When evaluating specialized or technical expert opinion testimony, "the relevant reliability concerns may focus upon personal knowledge or experience." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). The Court finds that Mr. Burwell would not have been qualified to opine that the City's taser training was inadequate. City Defendants contend that Mr. Burwell admits that he is not an expert in Arizona law enforcement training or Phoenix Police Department use-of-force training, has never reviewed Arizona's Peace Officers Standards and Training ("POST") materials, and does not know what POST training Arizona officers receive. According to City Defendants, Mr. Burwell is only familiar with California's POST training, which he admits is not the standard in Arizona. Plaintiffs do not controvert City Defendants' contentions but state that Mr. Burwell has the required qualifications and experience to opine as to the federal constitutional standards for the training of a street officer. Without knowing what training the City of Phoenix provides to its officers, however, Mr. Burwell cannot opine as to whether such training meets constitutional standards. Therefore, Mr. Burwell is not qualified to offer opinions regarding the officers' training.

- 28 -

establish municipal liability. *Blankenhorn*, 485 F.3d at 484. Absent evidence of a program-wide inadequacy in training, any shortfall in a single officer's training "'can only be classified as negligence on the part of the municipal defendant–a much lower standard of fault than deliberate indifference.'" *Id.* (quoting *Alexander v. City and County of San Francisco*, 29 F.3d 1355, 1467 (9th Cir. 1994)).

Plaintiffs attempt to get around their lack of evidence by arguing that the City ratified the officers' conduct. The City responds that "ratification" was not alleged in the complaint and has never been disclosed as a theory of liability. It argues that to allow Plaintiffs to assert that theory now, after discovery has closed, would prejudice City Defendants. Perhaps to avoid this issue, Plaintiffs do not directly assert "ratification" as a theory of liability. Instead, it seems that Plaintiffs' theory is that because the City of Phoenix Use of Force Review Board concluded that the officers' use of force was "in accordance with the Department's policies," the City necessarily provides inadequate training to its officers. Plaintiffs' evidence, however, pertains only to the two officers and the single incident at issue here and does not establish a city-wide policy. *See Blankenhorn*, 485 F.3d at 484 (finding that the evidence proffered by plaintiff, which included performance evaluations and internal affairs interviews regarding plaintiff's arrest, as well as prior complaints against officer, was insufficient to establish a city-wide policy). Therefore, even if there was a constitutional violation, Plaintiffs have no evidence to establish municipal liability.

### 4. Familial Association

Marquez's family members have asserted a familial association claim. However, Plaintiffs' familial association claim cannot survive without an underlying constitutional violation. *See Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001) ("[T]he state's interference with [the right to familial association] without due process of law is remediable under [42 U.S.C. §] 1983.") (quoting *Kelson v. City of Springfield*, 767 F.2d

651, 654-55 (9th Cir. 1985)). Because there was no underlying constitutional violation, City Defendants are entitled to summary judgment on this claim.

**5.   State Law Wrongful Death**

Plaintiffs allege that the officers were negligent and/or assaulted Marquez by tasing him, which resulted in his death. City Defendants respond that the officers' conduct was privileged under A.R.S. § 13-409, which provides that a person is justified in threatening or using physical force against another if, in making an arrest, all of the following factors are present: (1) a reasonable person would believe that such force is immediately necessary to effect the arrest; (2) such person makes known the purpose of the arrest or believes that it is otherwise known or cannot reasonably be made known to the person to be arrested; and (3) a reasonable person would believe the arrest or detention is lawful.

Plaintiffs first contend that A.R.S. § 13-409 addresses only the use of non-deadly force, whereas the officers here used deadly force. However, as indicated, at most, the use of the taser here constituted an intermediate level of force, not lethal or deadly force. Therefore, A.R.S. § 13-409 applies to this case.

Plaintiffs next contend that there is a genuine issue of fact as to whether a person would believe that the repeated use of the taser was immediately necessary to effect the arrest. A peace officer employs unlawful physical force in detaining a person if the force used exceeds that which a reasonable person would believe immediately necessary to effect the detention. *State v. Yoshida*, 195 Ariz. 183, 185, 986 P.2d 216, 218 (Ct. App. 1998). The Court has already concluded that the officers' use of force was not excessive, and therefore the first A.R.S. § 13-409 factor is satisfied. The second factor is also satisfied because the officers announced their presence to Marquez and warned him that the taser would be used if he did not comply with the officers' commands. Lastly, a reasonable person would have believed the arrest to be lawful since Destiny appeared to be in danger and Marquez had already assaulted Cynthia. Therefore, the Court finds that

City Defendants are protected by A.R.S. § 13-409 and are entitled to summary judgment on this claim.

**III.    *Daubert* Motions**

Because the Court finds that all defendants are entitled to summary judgment, Taser's Motion to Exclude Plaintiffs' Expert Stanley Buchanan (Doc. 148) and Motion to Exclude Plaintiffs' Expert William Anderson (Doc. 149), and Plaintiffs' Motion to Exclude Defense Expert Jeffrey Ho (Doc. 152) are moot and will accordingly be denied. City Defendants' Motion to Exclude Plaintiffs' Expert Ernest Burwell (Doc. 156) is granted in part as discussed above with respect to Burwell's opinion that the City did not provide adequate training.  The rest of the motion is denied as moot.

IT IS THEREFORE ORDERED that Taser's Motion for Summary Judgment (Doc. 146) is granted.

IT IS FURTHER ORDERED that Defendants City of Phoenix, David Guliano and Joshua Roper's Motion for Summary Judgment (Doc. 154) is granted.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Partial Summary Judgment (Doc. 150) is denied.

IT IS FURTHER ORDERED that Taser's Motion to Exclude Plaintiffs' Expert Stanley Buchanan (Doc. 148) and Motion to Exclude Plaintiffs' Expert William Anderson (Doc. 149), and Plaintiffs' Motion to Exclude Defense Expert Jeffrey Ho (Doc. 152) are moot and therefore denied.  City Defendants' Motion to Exclude Plaintiffs' Expert Ernest Burwell (Doc. 156), which Taser has joined (Doc. 157), is granted to exclude Burwell's opinion that the City did not provide adequate training.  The rest of the motion is denied as moot.

IT IS FURTHER ORDERED that the Clerk enter judgment in favor of Defendants and that Plaintiffs take nothing.  The Clerk shall terminate this action.

Dated this 24th day of August, 2010.

Neil V. Wake
United States District Judge